UNITED STATES BANKRUPTCY COURT

DISTRICT OF ARIZONA

In re:                                              ) Chapter 11
                                                    )
RIVERSIDE HOLDINGS, L.L.C.,                         ) Case No. 4-04-1727-EWH
                                                    )
_____                 )
                                                    )
RIVERSIDE HOLDINGS, L.L.C.,                         ) Adv. No. 04-00132
                                                    )
                    Plaintiff,                      )
v.                                                  ) **MEMORANDUM DECISION**
                                                    )
FIDELITY TITLE COMPANY                              )
PENSION AND PROFIT SHARING                          )
PLAN fbo LYLE T. DUNCAN; and                        )
LYLE T. DUNCAN, as Trustee,                         )
                                                    )
                    Defendants.                     )
_____                 )

## INTRODUCTION

Did the parties make a mutual mistake of fact in describing their indemnity obligations in their business dissolution documents? No. One of the parties made a mistake by assuming that a settlement proposed to a third party would be accepted and by only including a description of that proposed settlement in the indemnity provisions of the dissolution documents. A contract cannot be reformed based on the unilateral mistake of one of the parties. Nor can the parties' business dissolution agreements be rewritten on the basis of

ratification or estoppel. The reasons for these conclusions are set forth in detail in the balance of this memorandum decision.

**FACTUAL & PROCEDURAL HISTORY**

In late 1999 or early 2000, Lyle Duncan ("Duncan") and Manuel Silva ("Silva"), through their individual limited liability companies, became co-owners of Cochise County LLC ("Cochise"). Duncan obtained his 50% interest when the previous holder defaulted on his obligations to Duncan and Duncan foreclosed. Duncan is a certified title officer and owns and operates his own title company out of an office building he owns in Provo, Utah ("Office Building"). Duncan has a number of different business ventures and entities in Utah. Silva had no interest in any of those entities, including the Office Building. After Duncan and Silva became partners in Cochise, they decided to spin-off most of Cochise's assets into six separate limited liability companies (the "Duncan/Silva Entities"), each of which held title to one asset. Cochise retained title to undeveloped raw land located in Cochise County known as Lonesome Valley.

Shortly after Duncan and Silva became partners in the Duncan/Silva Entities, differences in their management style became evident. Sometime in the late spring of 2000, Andrew McKee ("McKee"), a former employee of one of Duncan's Utah entities, came to work with Silva, possibly as an equity holder, to assist with business operations.[1] Whatever

---

[1] The exact nature of McKee's relationship in the Duncan/Silva Entities is unclear. He testified that he was an 8% equity owner in Cochise and had "side agreements" which gave him a similar interest

2

McKee's interest may have been in the Duncan/Silva Entities, it apparently disappeared by June of 2002 because he was not a party to any of the agreements which are the subject of Duncan's claim for reformation.

By late 2001, it was clear that Duncan and Silva disagreed about more than management style; their relationship was completely breaking down. Beginning in December 2001, Duncan and Silva started negotiating the wind up of the Duncan/Silva Entities. Duncan prepared the first wind up proposal in December 2001. The final "Buy-Sell Exchange Agreement" ("Divorce Agreement") also prepared by Duncan was signed by both parties, six months later, on June 17, 2002.

Under the Divorce Agreement, the parties divided up the assets and liabilities of the Duncan/Silva Entities. The Divorce Agreement required Silva to indemnify Duncan for certain obligations, including any obligations arising out of three "operating agreements" with third parties. The terms of the operating agreements are not described in the Divorce Agreement. The operating agreements with two of the third parties had been reduced to writing prior to June of 2002. All three operating agreements are described in more detail in the Trust Deed Note and Performance Agreement dated June 18, 2002 ("Deed of Trust"). The Deed of Trust was signed by Riverside, LLC (Debtor) and Silva personally and secures

---

in the other Duncan/Silva Entities. None of the exhibits submitted into evidence regarding the Duncan/Silva entities mention McKee. He did receive 8% of the gross sales price when Cochise sold Lonesome Valley in June of 2000 for $700,000. Silva asserts that the payment was a form of real estate commission, which would have been illegal since McKee was not a licensed realtor at the time of the sale. McKee and Duncan assert it was a distribution to McKee for his a 8% equity interest. An equity distribution, is not, however, normally based on the gross value of an entities' assets.

3

Silva's indemnity obligations under the Divorce Agreement.[2] The operating agreement with the Peterson Family Trust ("PFT") is described in relevant part in the Deed of Trust as follows:

> "All the terms, covenants, and conditions of the verbal operating agreement with the Peterson Family Trust, Lonesome Valley property, which agreement is that sum in value of $70,000 per year commencing August 2000, and every year thereafter, be installed and added to their property in Lonesome Valley in the form of paved roads, culinary water systems, subdivided and platted lots, with utilities and amenities stubbed to the lot lines, and to hold Lyle T. Duncan harmless against any and all loss or cost, whether past, present or future whatsoever, . . ."

Duncan concedes that the "verbal operating agreement" described in the Deed of Trust never existed. Those terms were actually the terms of a settlement offer that Duncan made to the PFT at or about the same time of the Divorce Agreement and Deed of Trust were executed. Duncan also concedes the PFT never accepted the settlement offer and, therefore, the verbal operating agreement in the Deed of Trust never existed.

According to Duncan, there was an earlier agreement with the PFT ("Original Peterson Agreement") which both he and Silva knew existed when the Divorce Agreement was executed. According to Duncan, both he and Silva intended to include the Original Peterson Agreement in Silva's indemnity obligations in the event the PFT rejected the verbal operating agreement, but through mutual mistake forgot it. Duncan also asserts that the reference to the Peterson operating agreement in the Divorce Agreement encompassed

---

[2] The Debtor holds title to the real property subject to the Deed of Trust.

4

whatever agreement existed with the PFT and, therefore, included the Original Peterson Agreement.

Earlier in this case I denied Duncan's Motion for Relief from Stay on the grounds that the Deed of Trust did not secure Silva's indemnity obligation to Duncan regarding the PFT because the verbal operating agreement never existed and, therefore, there was no obligation for Silva to indemnify. In response to that ruling, Duncan filed a counterclaim in this adversary proceeding filed by the Debtor on December 17, 2004, seeking a determination of the extent and priority of Duncan's lien interest under the Deed of Trust. Duncan's counterclaim seeks a reformation of both the Divorce Agreement and the Deed of Trust to reflect what Duncan asserts was the parties' "true" intention regarding the scope of Silva's indemnification obligation with respect to the PFT. In the alternative, Duncan seeks reformation of the dissolution documents under theories of ratification and estoppel. An all day evidentiary hearing on Duncan's counterclaim was held on April 22, 2005. I granted Duncan the right to file a post-trial brief on certain evidentiary rulings I made at trial. That brief has been filed.[3] The matter is ready for decision.

---

[3] Defendant's Post-Trial Memorandum exceeded the scope granted by the Court. The parties chose to make closing arguments and not to file post-trial briefs. The Court did state Defendant could file a post-trial brief concerning their argument that part of Hornberger's testimony was not hearsay under Rule 803(3). The memorandum, however, also includes argument on other legal and evidentiary issues. Even if I consider those arguments, my ruling would be the same. Therefore, there is no reason to permit Silva's counsel to file a post-trial brief.

5

# ISSUE

1. Did Silva and Duncan make a mutual mistake of fact by failing to include the Original Peterson Agreement in the description of Silva's indemnification obligation in the Divorce Agreement and Deed of Trust?

2. Should the Divorce Agreement and Deed of Trust be rewritten to include the Original Peterson Agreement as part of Silva's indemnity obligation on the basis of ratification or estoppel?

# STATEMENT OF JURISDICTION

Jurisdiction is proper under 28 U.S.C. § 157(b)(2)(K) and 28 U.S.C. § 1334(a).

# DISCUSSION

1. Legal Standard for Contract Reformation

Reformation of a contract is a remedy available when both parties make a mutual mistake which allows the court to correct the written agreement to reflect the parties' true intentions. The party seeking reformation of a contract based on mutual mistake must show by clear and convincing evidence that the written agreement does not include the agreed upon terms. Nelson v. Rice, 198 Ariz. 563, 566, 12 P.3d 238, 244 (Ariz. Ct. App. 2000). More specifically, the moving party must show "that a definite intention on which the minds of the parties had met preexisted the written instrument and that the mistake occurred in its

execution." City of Scottsdale v. Burke, 19 Ariz. App. 11, 14, 504 P.2d 552, 555 (Ariz. App. Div. 1 1973) quoting Hackin v. Pioneer Plumbing Supply Co., 10 Ariz. App. 150, 457 P.2d 312, 320 (1969). Further, the mistake must have been made by both parties, and not just a unilateral mistake. Isaak v. Massachusetts Indem. Life Ins. Co., 127 Ariz. 581, 584, 623 P.2d 11, 14 (1981). Reformation is not an available remedy to enforce terms of an agreement that the parties never agreed to. Id.

When a court is determining whether a mutual mistake exists, the court should look outside the agreement and consider parole evidence, Long v. City of Glendale, 208 Ariz. 319, 331, 93 P.3d 519 (Ariz. Ct. App. 2004) especially to other previous or contemporaneous agreements of the parties concerning the same subject matter. Smith v. Superior Equip. Co., 102 Ariz. 320, 324, 428 P.2d 998, 1002 (1967). Further, when there are both specific and general provisions in a contract that refer to the same subject matter, the court should give greater weight to the more specific provisions. United California Bank v. Prudential Ins. Co. of America, 140 Ariz. 238, 273, 681 P.2d 390, 425 (Ariz. App. Div. 1 1983), citing Restatement (Second) of Contracts § 203(c) at 93 (1981).

2. <u>Applying the Legal Standard For Contract Reformation to the Facts in this Case</u>

Duncan seeks reformation of the Divorce Agreement and the Deed of Trust based on mutual mistake. Therefore, Duncan must show by clear and convincing evidence that both

7

parties agreed to terms other than those incorporated in the written agreements and that it was a mutual mistake to not include those terms. I turn first to Duncan's description of the Original Peterson Agreement, which he alleges was mistakenly excluded from the Divorce Agreement and Deed of Trust.

In July 2000, when Duncan was unable (or unwilling) to proceed with a tax-free exchange in which the PFT would purchase the Office Building, the PFT agreed to his proposed alternative to have the PFT purchase Lonesome Valley from Cochise. Under that alternative, the PFT would acquire title to Lonesome Valley, which was only worth between $350,000 to $400,000, for the sum of $700,000. Cochise would use some of the sale proceeds to pay off various liens and obligations, including payments to Duncan, Silva and the payment to McKee described earlier. Over $300,000 of the sale proceeds would be set aside in a separate Piper Jaffrey account to be used by Las Palominas LLC ("Palominas"), another Duncan/Silva entity, to develop 11 real property lots by placing and selling modular homes on the lots. The house sale proceeds were to be deposited into a "Peterson Pot." By February or March 2001, the Peterson Pot would total $700,000 plus 10% interest. That money would then be paid to an agent of the PFT to buy back Lonesome Valley. The PFT agent would use the "buy back" funds to acquire a suitable property for the PFT in Utah. According to Duncan, only if the PFT's agent was unable to find a suitable property, would

8

the Office Building be sold to the PFT.[4] After the PFT purchased the Office Building, it would agree at some time in the future to resell it to Duncan.

There are only four documents which memorialize what Duncan asserts are the terms of the Original Peterson Agreement: (1) a purchase agreement from Cochise to the PFT signed by Silva on behalf of Cochise which indicates that the PFT acquired Lonesome Valley with $700,000 of exchange proceeds; (2) a settlement statement also signed by Silva on behalf of Cochise which indicates that over $300,000 of the sale proceeds were deposited into the Piper Jaffrey account; (3) a deed from Silva conveying Lonesome Valley to the PFT; and (4) a handwritten memo titled "Lonesome Valley Provo Building Exchange" dated July 10, 2000 which is signed by members of the PFT and Hornberger, and initialed by Duncan. The only reference to Lonesome Valley in the Lonesome Valley Provo Building Exchange is the following: "Do the itchy switchy 2001 February or March." The balance of the document is devoted to terms involving the sale to the PFT and possible repurchase of the Office Building by Duncan.

There is no evidence that a Peterson Pot account was opened. There is no written repurchase agreement for Lonesome Valley between Cochise and an agent of the PFT. There is no written agreement between Cochise and Palominas, regarding the development of the 11 home lots or accrual of 10% interest in favor of the PFT. There is no written agreement

---

[4] According to Duncan and Mark Hornberger ("Hornberger"), PFT's Utah real estate agent, the repurchase of Lonesome Valley had to be done through an "agent" in order to comply with IRS regulations related to tax-free exchanges.

9

between and among Cochise, Palominas and the PFT or its agent stating that all monies realized from the Palominas home sales would be held for the benefit of the PFT or impressing a constructive lien on the homes in favor of the PFT.

Almost every element of Duncan's version of the Original Peterson Agreement is contested by Silva and/or the Petersons. John Peterson, a PFT trustee, gave a deposition in which he claimed that the Petersons knew nothing about the use of the Lonesome Valley sale proceeds to develop houses in Arizona by another Duncan/Silva entity. He testified that he believed the sale proceeds realized from the Lonesome Valley sale were to be used to clear liens off of the Office Building so Duncan would be able to sell it to the PFT in February or March 2001. Mr. Peterson also asserted that the Petersons never agreed to look for another "suitable" property and that at all times the only agreement the PFT had with Duncan involved obtaining the Office Building in a tax-free exchange in February or March of 2001.[5]

Silva denies that he was ever aware of all of the terms of the Original Peterson Agreement. Specifically, he denies Duncan's claims, substantiated by McKee and Hornberger that he participated in a conference call with Duncan and the Petersons on July 10, 2000 in which all of the terms of the Original Peterson Agreement were allegedly explained and agreed to by all parties, including the Peterson trustee.[6]

---

[5] The PFT has sued Duncan in Utah for default under the PFT's version of the Peterson Agreement. Neither Silva or Cochise are named as defendants in that suit.

[6] At trial, I sustained Silva's objections to Duncan's efforts to prove that the Peterson trustees agreed to Duncan's version of the Original Peterson Agreement. I held that Hornberger was only the PFT's agent in Utah and that, therefore, his testimony regarding PFT's consent related to acquisition of Arizona property was not admissible as the testimony of an agent. I also denied Duncan's efforts to

10

Fortunately, I do not need to decide if there was an Original Peterson Agreement or if its terms are those alleged by Duncan. I do not need to reach that issue because Duncan has provided insufficient evidence to demonstrate that, in June 2002, both he and Silva made a mistake by only including the reference to the Peterson "verbal operating agreement" in describing Silva's indemnification obligations in the Deed of Trust. Duncan must establish the existence of that allegedly mutual mistake by clear and convincing evidence before a determination needs to be made about the existence and scope of the Original Peterson Agreement. Duncan has failed to meet that burden.

Duncan points to numerous instances in the record which demonstrate that Silva was aware that there was an obligation to "pay back" the Petersons the amount of $700,000 plus 10% interest and that Silva knew that "pay back" obligation was in default many months before the execution of the Divorce Agreement. The record does demonstrate that Silva was aware that there was an obligation from Cochise to the PFT. Silva, however denies that he knew or agreed that all proceeds from the development of the Palominas lots had to be used exclusively to satisfy the requirement to "pay back" the PFT or that the deadline to make the repayment was February or March of 2001. On the other hand, there is evidence that Duncan indicated to Silva that monies realized from the sale of the Palominas lots could be used to

---

admit evidence of the PFT trustees' consent to the terms of the Original Peterson Agreement as a then existing mental condition under Rule 803(3) of the Federal Rules of Evidence. Duncan has filed a post trial brief urging reconsideration of those rulings and urging that I find that the testimony regarding the Peterson trustees' alleged consent was not hearsay either because the consent was a verbal act or because they were the prior statements of a witness under Rule 801(d)(1). However, even if I were to consider the excluded evidence, it would not change my ruling, so I will not revisit my evidentiary rulings.

11

pay the obligations of other Duncan/Silva entities and that the houses could be leased as well as sold. Those statements are completely inconsistent with what Duncan asserts were the terms of the Original Peterson Agreement regarding placing all of the home sale proceeds in a separate account for the benefit of the PFT or repurchasing Lonesome Valley in 6 to 8 months.[7]

Duncan argues that over the course of the six-month negotiation period with Silva on the wind up of the Duncan/Silva Entities, that he made it very clear that there would have to be indemnification provisions in the final agreement. One of the exhibits submitted by Duncan includes the following language: "I insist on mutual indemnifications on offsetting collateral to each other to secure the payment of the company debts that we assume." However, a memo from Duncan that includes language insisting on general indemnification obligations does not demonstrate, by clear and convincing evidence, that Silva intended to indemnify Duncan for anything more than what is set forth in the Deed of Trust.

Had Duncan been more specific in his communications with Silva about the scope of the indemnity he was seeking regarding the PFT, it is unclear if Silva would have consented to Duncan's request. In June of 2002 when the dissolution documents were signed, the Original Peterson Agreement was, according to Duncan, in substantial and "hopeless" default. That would have meant that upon rejection of the "verbal operating agreement" by

---

[7] At trial, Duncan explained that he only made suggestions about leasing the 11 houses after the Original Peterson Agreement was in default and he was trying to figure out some way to compromise with the PFT, but using money generated by the 11 homes for anything other than the obligation due to the PFT is inconsistent with Duncan's version of the agreement before or after a default.

12

the PFT, that Silva would have been immediately responsible for paying the PFT $700,000 plus accrued interest at 10% and selling the Office Building, which he did not own, to the PFT if their agent did not find another suitable investment exchange property. In such circumstances, if Silva defaulted, which seems likely because the evidence indicates he did not have $700,000 not to mention the difficulty of assuring the sale of a building he did not own, Duncan would have been able to foreclose the Deed of Trust thereby recovering all of the assets of the Duncan/Silva entities. Given the likely disastrous results for Silva if he agreed to such an indemnification, the evidence would have to demonstrate specifically and clearly that Silva was aware: (1) of all of the terms of the Original Peterson Agreement and (2) intended to indemnify Duncan for all of those terms. However, in reviewing all of the evidence submitted at trial, including transcripts of both Duncan and Silva's 2004 examination testimony, a transcript of a pending proceeding in Cochise County Superior Court[8] as well as the testimony of both Duncan and Silva in earlier hearings before this court, I find that there is not clear and convincing evidence that Silva ever intended or agreed to indemnify Duncan for anything other than the "verbal operating agreement" described in the Deed of Trust.

Duncan's principal explanation for the omission of the Original Peterson Agreement from the Divorce Agreement and Deed of Trust is that he and Silva both mistakenly believed that the PFT trustees would agree to the terms of the "verbal operating agreement."

---

[8] Cochise County Case # CV-200300073

13

However, it is undisputed that Silva did not have access to the PFT trustees. All of the negotiations with the trustees were conducted by Duncan. Duncan testified that at the time the Divorce Agreement and Deed of Trust were executed, he believed that the Petersons would accept his proposed settlement offer. He apparently shared that belief with Silva. There is no evidence that he ever suggested to Silva in June of 2002 that the settlement had not yet been accepted by the PFT. Silva testified that he did not know that the PFT trustees had rejected the settlement until months later and only learned about the rejection in litigation. Duncan was the party with the ability and knowledge to describe any agreement with PFT, not Silva, who had no direct contact with the PFT trustees. Furthermore, there is no language in the Deed of Trust which indicates that there might be any other obligation to the PFT for which Duncan was seeking indemnification. It was a mistake for Duncan to believe that the PFT would accept the "verbal agreement" but it was not a mutual mistake, it was Duncan's mistake. As stated earlier, unilateral mistake cannot be the basis for reformation of a contract. See Isaak, 623 P.2d at 14.

Duncan attempts to avoid the mistaken description of the "verbal operating agreement" in the Deed of Trust by arguing that when the Divorce Agreement and the Deed of Trust are considered as one transaction it is clear that the parties intended to include all existing "operating agreements" with the PFT which would include the Original Peterson Agreement. Setting aside the question of whether the Original Peterson Agreement, which is an agreement to buy and sell real property, could be considered an "operating" agreement,

14

Duncan's argument fails under basic principles of contract construction. None of the terms of the three operating agreements described in the Divorce Agreement are specified. All three of the operating agreements are more fully described in the Deed of Trust. Two of those operating agreements had been reduced to writing and the evidence indicates that the description of those agreements in the Deed of Trust was consistent with the written agreements. There was no written operating agreement with the PFT. The "verbal operating agreement" described in the Deed of Trust is much more specific than the general reference to an operating agreement contained in the Divorce Agreement. Under principles of contract construction the more specific provisions control. See United California Bank, 681 P.2d at 425. Therefore, the generalized language of the Divorce Agreement cannot be used to read the Original Peterson Agreement into Silva's indemnity obligations.

3. Ratification and Estoppel

Duncan argues two other alternatives exist to justify the rewriting of the Divorce Agreement and Deed of Trust to include the Original Peterson Agreement in the scope of Silva's indemnity obligation----ratification and estoppel. However, even if Silva did ratify the Original Peterson Agreement, that does not mean he agreed in June of 2002 to indemnify Duncan for the performance of that agreement.

Equitable estoppel is an accepted doctrine in Arizona, but only where (1) the conduct of one party induces the other party to believe in certain material facts, (2) the inducement

15

is justifiably relied on, and (3) the resulting acts cause injury. Heltzel v. Mecham Pontiac, 152 Ariz. 58, 61, 730 P.2d 235, 238 (1986). The Court fails to see what conduct of Silva induced Duncan to believe that the PFT would accept the "verbal operating agreement" as a compromise. Since Duncan cannot meet the first requirement needed to estabiksh equitable estoppel, I need not address the other requirements.

## **CONCLUSION**

There was a mistake made by Duncan in believing that the PFT trustees would consent to the terms of a proposed settlement. However, Duncan's mistake about what the trustees would agree to is not a mutual mistake about the scope of Silva's indemnity obligation. Considering the record as a whole, I find that there is insufficient evidence to demonstrate that Silva intended or agreed to indemnify Duncan for anything other than the verbal operating agreement described in the Deed of Trust. There is no basis for a claim of equitable estoppel and Silva's ratification of the Original Peterson Agreement, even if it occurred, does not constitute an agreement to indemnify Duncan for its terms.

This decision is limited to the scope Silva's contractual indemnity obligation to Duncan regarding any liability the Duncan/Silva Entities may have to the PFT. I have not decided if any such liabilities exist, only that Silva has not contractually agreed to indemnify Duncan for such liabilities. The only obligation to the PFT that Silva did contractually agree

16

was subject to his indemnification obligations is non-existent. Accordingly, there is no PFT indemnification obligation for the Deed of Trust to secure.

The foregoing constitute my findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052. A judgment in favor of the plaintiff/counter-defendant on the defendant counterclaimant's claim will be entered this date.

Dated this 24th day of May, 2005.

*Eileen W. Hollowell*
Eileen W. Hollowell
U.S. Bankruptcy Judge

Copy of the foregoing served as indicated below this 24 day of May, 2005, to:

Scott D. Gibson, Esq.
Kristen M. Green, Esq.
Gibson, Nakamura & Green, P.L.L.C.
2941 North Swan Road, Suite 101
Tucson, AZ 85712
Attorneys for Debtor
sgibson@gnglaw.com
kgreen@gnglaw.com

Alan R. Solot, Esq.
Tilton & Solot
459 North Granada Avenue
Tucson, AZ 85701
Attorney for Creditor Fidelity Title Company
Pension and Profit Sharing Plan fbo Lyle T. Duncan
arsolot@tiltonandsolot.com

17

| | |
|---|---|
| 1 | Sherman Young, Esq. |
| 2 | Ivie & Young |
|   | 226 West 2230 North |
| 3 | Provo, UT 84603 |
|   | Co-counsel for Lyle T. Duncan |
| 4 | shermanyoung@hotmail.com |
| 5 | |
|   | Christopher J. Pattock, Trustee |
| 6 | Office of the U.S. Trustee |
| 7 | 230 North First Avenue #204 |
|   | Phoenix, AZ 85003-1706 |
| 8 | Christopher.J.Pattock@usdoj.gov |
| 9 | |
| 10 | By _____ |
|    | Judicial Assistant |

18